**Commonwealth v. Spector**

*Edward Cameron,* assistant district attorney, for the commonwealth.

*Joel Harvey Slomsky,* for defendant.

BERNSTEIN, *J.,* January 9, 1989—

*Soon after one picks up man's trail in the earliest campfire or chipped stone tool one finds evidence of interests and anxieties that have no animal counterpart; in particular, a ceremonious concern for the dead, manifested in their deliberate burial — with growing evidence of pious apprehension and dread.[1]*

Whether one believes an immortal soul inhabits the body as its holy vessel on earth or only ascribes to a humanistic belief in every individual's right to determine the disposition of his or her remains after death, the crime of dismemberment, theft, and sale of a human body is abhorrent.

Pennsylvania state law fully regulates all aspects of the disposition of bodily remains including their use for medical purposes.[2] The Humanity Gifts

1. Lewis Mumford, *The City in History,* Harcourt, Brace and World Inc., New York, 1961.

2. 35 P.S. §1091 et seq. See also 35 P.S. §1111 and 20 Pa.C.S. §8601.

Registry has, since 1983, been the exclusive agency empowered to receive and distribute bodies to medical schools or doctors for scientific study or teaching in the Commonwealth of Pensylvania.[3] Every university, school, college, physician, surgeon or association permitted to receive a body is required to post a bond and can use that body "only for the promotion for medical science *within this state.*"[4] Pennsylvania law absolutely prohibit all trafficking in bodies "to any place outside of this state."[5] After a medical institution has completed its study or teaching, each donated body is either sent to a funeral home for burial or is cremated and buried in an individual plot at the expense of the Humanity Gifts registry. If cut or divided during teaching or study, the bodily integrity of each individual is restored prior to cremation and burial. An annual memorial service, which is well attended by family and friends of the deceased, is conducted by the registry. Pennsylvania law also makes it a criminal act to abuse a corpse. This crime is committed by treating a corpse in a way that would outrage ordinary family sensibilities.[6]

On numerous occasions between 1982 and 1986 defendant received heads and arms dismembered and stolen for him by autopsy assistants at major medical institutions in Philadelphia. After delivery to his Center City office defendant sold the stolen heads and arms to medical institutions across the country.[7] In July 1986, 20 human heads, stolen by

---

3. 35 P.S. §1091 et seq.

4. 35 P.S. §1091.

5. 35 P.S. §1095.

6. 18 Pa.C.S. §5510.

7. It appears that each individual whose head or other body part was dismembered had either donated his or her body to·

Mr. Linwood Summers from the University of Pennsylvania morgue, were delivered to defendant's office for which he was paid $150 a head in cash. These crimes were uncovered because the heads were mailed to the wrong address.

Detective Al Nespoli discussed these crimes with defendant on July 23, 1986. Defendant stated that he had been shipping body parts for 20 years. While claiming that he did not "exactly" know where the parts were coming from he said that he did not think that the autopsy assistant from whom he received them was killing people. He repeatedly told Detective Nespoli that he would not reveal his sources but would rather pay a fine or go to jail.

A formal statement was taken by Sgt. Daniel Rosenstein on August 14, 1986. In pertinent part defendant said:

"If I give you the name (of the person who supplied the parts) he would get in trouble. I know what he is doing is wrong. . . . I don't keep any records. Everything I do is in cash. I give him $150 a head, $65 a half head, $65 for arms. You can't get anyone to do it. Body parts are hard to come by. Why do you think I get calls from Colorado? I've got a doctor in Florida begging me for heads right now, . . . I didn't know for sure where the heads come from but I think my diener has another diener who gets them the heads . . . I've been getting heads for about a year, ears for 20 years and arms for one year.

---

the Humanity Gifts registry for scientific use followed by intact burial or were people whose family had granted permission to medical institutions *only* for autopsy. No one authorized having his or her body dismembered and shipped interstate. Pennsylvania law requires authorization and consent for the performance of autopsy. See 35 P.S. §1111.

This wouldn't have happened if Karen didn't send out the packages with the wrong address. That's the kind of help you get these days. . . . "

On September 1, 1988, in Courtroom 483, defendant pled no contest to the charges of "theft by unlawful taking," as a felony of the third degree, "criminal conspiracy" as a felony of the third degree, "abuse of corpse" as a misdemeanor of the second degree and "schools to give bonds before receiving bodies" which is a misdemeanor of the third degree.

At the time of sentencing Dr. Spector was 72 years old and was working in his private practice of medicine at his home located at 2136 Locust Street. After graduation from Temple Medical School in 1939 he performed a medical internship at Northeastern Hospital and served honorably in the U.S. Army during World War II as a medical officer. He has practiced medicine privately since 1946. He became board certified in his specialty of otolaryngology in 1953 and had been on the medical staff of St. Mary's Hospital, Kensington Hospital, University of Pennsylvania Medical School and Graduate Hospital. He has authored the medical textbook *Dizziness and Vertigo.*

According to his attorney, Dr. Spector continues to practice medicine at his 2136 Locust Street address and at his office located on East Allegheny Avenue approximately 20 hours a week. His full-time staff included a secretary, audiologist, and two medical assistants. In addition to his medical practice which grossed approximately $247,000 in 1986, the Spector family owns numerous Center City properties debt-free having a value of several million dollars. Dr. Spector's annual gross income from all

sources exceeded $500,000. According to his personal physician Dr. Leonard Lecks: "Dr. Spector has had high blood pressure for a number of years and an active peptic ulcer for some years." Attached to defendant's sentencing memorandum were numerous exhibits including a bibliography of Dr. Spector's publications, letters of support from doctors throughout the country, letters from patients, friends, associates as well as from his family and employees.

In a prepared statement submitted to the court presentence investigator and contained in the presentence report, Dr. Spector stated: "I believe then, as I do now, that I was making my small contribution to the cause of humanity by assisting surgeons in learning techniques that were so essential to help people with disease or defects mainly to the head and also to the hand." When offered the opportunity to comment at the time of his plea, defendant stated only: "I only did this to help humanity."

The purposes of sentencing include punishing the offender, rehabilitating the defendant, insuring that the individual defendant does not commit additional crimes and deterrence of criminal activity on the part of others. The sentence fashioned in each individual case must weigh these and other competing factors as they apply to the individual before the bar of the court for sentencing.[8] Dr. Spector presented himself by his own statements, through the representations in his presentence

8. See, e.g., *Commonwealth v. Doyle,* 275 Pa. Super. 373, 418 A.2d 1336 (1980) and Pa.R.Crim.P. 1403(A)(3): "The presentence investigation report shall include information regarding the circumstances of the offense and the character of the defendant sufficient to assist the court in determining sentence."

memoranda and by his statement to the presentence investigator as both unrepentant and adamant in his belief that he acted without venality and exclusively for the altruistic advancement of science. If this is to be believed it reflects a significant flaw in the character of an individual who has otherwise served society well and in return received handsome pecuniary reward.

The medical profession is not a disinfranchised minority in the United States. On the contrary the medical profession is justifiably well-respected and powerful. Scientific accomplishment is applauded. Medical research and teaching are encouraged and supported, both governmentally and privately. As a people, Americans respond to appeals for medical research with financial resources and with blood and organ donation.[9] When the medical profession appropriately present their concerns, legislators listen, and remedial legislation is adopted.

No evidence was presented that Dr. Spector ever served humanity or science by trying to lawfully change the procedures under which the use of bodies is regulated in Pennsylvania. No evidence was presented that Dr. Spector ever communicated

9. 20 Pa.C.S. S8601 et seq. The Uniform Anatomical Gifts Act regulates anatomical gifts within the Commonwealth of Pennsylvania and *requires* that each acute care general hospital develop a protocol for identifying potential organ and tissue donors and requires that appropriate personnel ask next of kin at or near the time of notification of death whether or not appropriate organs and tissues would be donated for medical use. Of interest in the context of this case, the law mandates sensitivity. The law specifically requires: "The protocol shall encourage discretion and sensitivity to family circumstances in all discussions regarding donations of tissue or organs. The protocol shall take into account the deceased individual's religious beliefs or non-suitability for organ and tissue donation."

with the physicians or administrators at the respected institutions from which body parts were stolen to apprise them of medical needs in other parts of the country and ask their assistance.[10] No evidence was presented that Dr. Spector ever attempted to arrange for the direct transmission of body parts to medical institutions outside of Pennsylvania. Instead, defendant paid cash for bodies cut apart and stolen by stealth.

Defendant's crimes are not merely technical violations of obscure health regulations. These crimes concern the respect for individual life manifested by the ceremonious reverence for the dead. These crimes trample significant interests of every civilized society, interests which the people of Pennsylvania properly demand be protected and which the legislature has fully regulated. This court finds that while misguided altruism and a need for respect and power over other members of his profession were elements of the motivation for these crimes, defendant was also motivated by the financial benefits he received. Accordingly, defendant required a sentence which would effect a personally changed consciousness and create an awareness in himself and others of the criminality of his actions.

Dr. Spector was sentenced to two years probation and a $15,000 fine on each count of theft and criminal conspiracy, a $5,000 fine and two years probation on the charge of abuse of corpse and a $200 fine with $100 costs and $25 to the victim's witness and victim's abuse funds on the charge of "schools to give bonds before receiving body." Ad-

---

10. Pennsylvania law at 35 P.S. §1092 makes available for scientific use within Pennsylvania all dead human bodies required to be buried at public expense.

ditionally, defendant was ordered to perform 1600 hours of public service and to charge for no professional services until he had completed 300 hours of that community service. A timely appel was taken following the imposition of this sentence, complaining that the sentence was both excessively harsh and constituted an illegal fine.[11]

Since the court concluded that a jail sentence for this 72-year-old physician was inappropriate, a sentence was fashioned which was designed to require Dr. Spector to atone by his labors for his transgression and to discourage further trafficking in human bodies by the maximum permissible fine for the crimes to which he pled no contest.

The Sentencing Code authorizes a fine as a sentence additional to total or partial confinement or probation when either the defendant has derived a pecuniary gain from the crime or the court is of the opinion that a fine is specially adapted to deterrence of the crime involved or to the correction of the defendant.[12] In the present case the record reveals that defendant received more than $20,000

---

11. Prior to filing the appeal defendant filed a motion to modify the sentence. This was not acted upon within 30 days and was thereby deemed denied. (See Pa.R.Crim.P. 1410 and comments thereto; see also, Pa.R.A.P. 1710). At no time was this sentence vacated or stayed but following a hearing on January 9, 1989, the community service placement was modified and the prohibition on billing for professional services until he had completed 300 hours of community service was clarified to begin when the probation department provided appropriate community service. This modification resulted in a second appeal. Since these changes do not concern the basis of appeal, for the purposes of this opinion the original sentence and the changes as described in the hearing of January 9, 1989 will be treated as the same sentence.

12. 42 Pa.C.S. §9726.

from the sale of body parts.[13] Accordingly both standards for imposing a fine are met and this court imposed the maximum permissible fine of $32,500. Realistically a fine can be insufficient disincentive to criminal behavior by the affluent and can be easily viewed as a cost of a criminal enterprise, a calculated risk.[14] The requirement of a period of public service, however, is a significant infringment upon the liberty of an affluent citizen and a public demonstration of penance which can effectively act as a deterrent to further criminality by Dr. Spector or others similarly situated. Accordingly the court imposed 1600 hours of public service.

The defense also complaints that the court imposed an unlawful condition in requiring Dr. Spector to perform 300 hours of community service before billing for any professional services. A probationary sentence can appropriately restrict the freedom of a criminal whom the court deems not in need of incarceration as individual punishment, rehabilitation or as deterrence. The law permits the court to regulate the residence, direct and control medical or psychiatric treatment, and restrict the travel and vocation of a probationer.[15] Based upon

---

13. Defendant claims to have paid in excess of $10,000 to the persons who dismembered and stole the heads, arms and inner ears and expended the rest of the sums received for miscellaneous "overhead" expenses. The court does not accept this rendition of events, concluding that the sale of body parts did result in financial remuneration and pecuniary gain.

14. This fine is being paid by Dr. Spector at the rate of $1,500 per month.

15. See, generally, 42 Pa.C.S. §9754, Order of Probation. Section 9754 controls the order of probation authorizing the court to attach "such of the reasonable conditions authorized . . . as it deemed necessary to insure or assist the defendant in leading a law-abiding life." The specific conditions authorized at section C of that act include at section 2: "to devote himself

the letters and representations of physicians contained in his initial sentencing memorandum, the court concluded that despite Dr. Spector's criminal activities over many years, the patients who continue to maintain confidence in his abilities as a physician should not be punished by resticting his right to treat them. This probation order imposes no restriction whatsoever upon such medical treatment. This order permits Dr. Spector to continue his "service to humanity" by continuing to treat his patients without interruption. On the other hand Dr. Spector's attitude, his lack of remorse and his entire approach to these criminal charges from the initial confrontation by Detective Nespoli to the last reconsideration hearing demonstrate that Dr. Spector needs a financial incentive to *timely* and productively accomplish community service. In the court's judgment the financial incentive of being unable to charge for his professional services until such time as a modest portion of the community service requirement was fulfilled would more

---

to a specific occupation or employment"; at section 2.1: "to participate in a public or non-profit community service program"; and at section 13: "to satisfy any other condition reasonably related to the rehabilitation of the defendant and not unduly restrictive of his liberty or incompatible with hs freedom of conscience." See also *Commonwealth v. McBride,* 289 Pa. Super. 396, 433 A.2d 509 (1981), (not illegal curtailment of liberty to restrain defendant from contract with victim). See, also 18 U.S.C. §3563 (as amended November 1987) for the equivalent federal provisions in the federal sentencing guidelines. See *United States v. Restor,* 529 F.Supp. 579 (W.D. Pa. 1982) for scope of probation under prior federal law. *Restor* involved ordering union officers to perform eight hours per week of community service. See also *United States v. Waxman,* 638 F.Supp 1245 (E.D. Pa. 1986) in which the sentencing court restricted the defendant's ability to capitalize monetarily from his crime of art theft. In both cases, no undue restriction of liberty was found.

surely cause diligent and active compliance by Dr. Spector than any theoretical fear of prison.

Following sentencing defendant sought reconsideration. His petition for reconsideration of sentence states: "Dr. Martin Spector is 72 years old and is simply not in any physical condition to do 16 hours a week of community service for two years plus travel time *in addition* to maintaining his office work." (emphasis supplied) Later in the same petition he represents: "his office is still opened 16 hours a week . . . " The gravaman of his request for reconsideration which forms one basis for appeal is succinctly stated at paragraph 7: "counsel represents that Dr. Spector would be willing to cut back on his office hours in order to do community service. But if he is forced not to have his office opened at least 12 hours a week, it would render his medical practice *financially unprofitable* and would compel him to close his office altogether and lay-off his three employees which is something he does not wish to do. His health and mental state will not allow him to work 32 hours a week."[16] The defense arrogantly represents that the requirement of community service imposed should be reduced because it would damage Dr. Spector's ability to profit from his private practice of medicine. This court does not accept this as an appropriate basis to reduce the number of hours of community service.

Although Dr. Spector proclaims himself a humanitarian, he demonstrated no remorse over his thefts. He has demonstrated no willingness to atone

16. It is further represented in this defendant's petition for modification that Dr. Spector's "lifeline" is the practice of medicine which he does not want to stop. Apparently the practice of medicine as a community public service is inadequate spiritual fulfillment.

nor even any understanding of why he now faces society with a criminal record. His original sentencing memorandum suggested that his health problems can permit only three hours a week public service. This representation while working 20 hours a week for pay in his private practice of medicine trivializes his crimes and insults both the individual whose bodies he had dismembered and their families. Defendant is capable of performing the level of community service ordered.[17]

It is indeed unfortunate that Dr. Spector does not yet understand that true healing arts emanate from an abiding respect for the individual, his body, his soul and a respect for that individual's will while alive as to the disposition of his or her bodily remains after death. It is hoped that in the course of fulfilling the sentence imposed, complying with the punishment it contains and serving the community it requires, Dr. Spector will come to an understanding of why society deems his past actions criminal and by example deter others similarly situated.

---

17. The court notes that probationary sentences are always subject to change based on changed conditions and therefore should a modification be necessary at a later time it can occur. However a sentence of 1600 hours in prison to be followed by two years probation could not be modified beyond 30 days from the time of imposition.